UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JACQUELINE ROUSE,

                 **Plaintiff,**

                                                                                        5:04-CV-791

     v.                                                                                    (FJS/DRH)

COMMISSIONER OF SOCIAL SECURITY

                 **Defendant.**
_____

| **APPEARANCES** | **OF COUNSEL** |
|---|---|
| **MCMAHON, KUBLICK & SMITH, P.C.**<br>500 South Salina Street<br>Suite 816<br>Syracuse, New York 13202<br>Attorneys for Plaintiff | **JENNIFER G. SMITH, ESQ.** |
| **OFFICE OF THE UNITED STATES ATTORNEY**<br>100 South Clinton Street<br>Syracuse, New York 13261-7198<br>Attorneys for Defendant | **WILLIAM H. PEASE, AUSA** |

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

      Plaintiff Jacqueline Rouse, who suffers from bilateral vestibular neuritis, commenced this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of Defendant's administrative determination denying her application for benefits under the Social Security Act. Currently before the Court are Plaintiff's objections to Magistrate Judge Homer's January 3, 2006 Report-Recommendation and Order, in which he recommended that the Court affirm the Administrative

Law Judge's ("ALJ") decision to deny Plaintiff disability benefits and deny Plaintiff's motion for a finding of disability.

## II. BACKGROUND

### A. Procedural History

On October 7, 2002, Plaintiff filed an application for disability insurance benefits pursuant to the Social Security Act, 42 U.S.C. § 401 *et seq*. The application was denied following the initial determination and on reconsideration. As a result, Plaintiff requested a hearing before an ALJ, which was held on November 21, 2003. On April 30, 2004, the ALJ issued a decision denying Plaintiff's claims. On May 27, 2004, the Appeals Council denied Plaintiff's request for review, making the ALJ's findings the final decision of the Commissioner. Subsequently, on July 8, 2004, Plaintiff commenced this action.

### B. Plaintiff's Personal Background

Plaintiff is a thirty-three year old mother of two young children, who claims that she became disabled on December 4, 1998, due to vestibular neuritis, vertigo, fatigue, vision problems and irritability. She had previously worked as a cashier and a secretary. Although Plaintiff needs help caring for her children, those who help her – her mother, her mother-in-law, and her husband – work other jobs. Plaintiff is capable of preparing easy meals, doing light housework, grocery shopping in three small trips each week, and driving her daughter to pre-school three days each week. Furthermore, although she has an unrestricted driver's license, Plaintiff only drives a quarter mile three days each week to the grocery store and to take her daughter to pre-school. However, Plaintiff

has also tolerated a four and one-half hour drive to vacation in New Jersey.  She stopped working as a secretary in December 1998 due to pregnancy and gave birth in 1999; she had intended to return to work.

### III. DISCUSSION

**A.    Standard of review**

"To review a disability determination under 42 U.S.C. § 423(a)(1), the Court must consider: (1) whether the Commissioner applied the correct legal principles in making his determination, and (2) whether substantial evidence supports the Commissioner's determination." *McLay v. Apfel*, No. 99-CIV-3505, 2001 WL 197879, *1 (S.D.N.Y. Feb. 20, 2001) (citing 42 U.S.C. § 405(g)) (other citation omitted).  Substantial evidence constitutes "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "It is the responsibility of the Court 'to conduct a searching inquiry and to scrutinize the entire record, having in mind that the Social Security Act . . . is remedial in purpose.'" *Id.* (quoting *McBrayer v. Secretary of Health & Human Servs.*, 712 F.2d 795, 798-99 (2d Cir. 1983)).

**B.    Definition of Disability under the Social Security Act**

To demonstrate that she is disabled within the meaning of the Social Security Act, a claimant must prove that "[s]he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."

42 U.S.C. § 1328c(a)(3)(A). Furthermore, the impairment must be so severe

> that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area . . . or whether a specific job vacancy exists . . . or whether [s]he would be hired . . . .

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses the following five-step evaluation process to determine whether a claimant is disabled:

> [1] the Commissioner considers whether the claimant is engaged in substantial gainful activity[;] . . .
> [2] the Commissioner considers whether the claimant has a severe impairment[;] . . .
> [3] the Commissioner considers whether the impairment is "listed," which means that the claimant will be found to be disabled without consideration of vocational factors such as age, education, and work experience[;] [i]f the claimant does not have a listed disability . . .
> [4] the Commissioner considers . . . whether the claimant has the residual functional capacity to perform her past work[;] . . . [and]
> [5] the Commissioner considers whether the claimant can perform other work that exists in the national economy.

*McLay*, 2001 WL 197879, at *2 (citing 20 C.F.R. § 404.1520).

The burden of proof is on the claimant with respect to the first four steps and on the Commissioner with respect to the fifth. *See id.* (citation omitted).

C.  **Magistrate Judge Homer's recommendations**

Magistrate Judge Homer concluded that there was substantial evidence in the record to support the ALJ's decision to afford little weight to the opinion of Dr. Woods, Plaintiff's treating physician. *See* Report-Recommendation and Order at 10. Magistrate Judge Homer indicated that

the three treatments that Dr. Woods provided to Plaintiff over a period of ten years were intermittent and infrequent and that there was no evidence to indicate that Plaintiff's symptoms worsened or became so severe that she sought further treatment from Dr. Woods or Dr. Gacek.[1] *See id.* at 9. Furthermore, only one of Dr. Woods' treatments and none of Dr. Gacek's occurred after the onset of Plaintiff's alleged disability. *See id.* Magistrate Judge Homer also indicated that Dr. Woods' opinion was not consistent with his own treatment notes, which indicated that Plaintiff's symptoms had not worsened, that she was compensating well, and that her condition was stable. *See id.* Although Magistrate Judge Homer acknowledged that Plaintiff's electronystagmographies ("ENG") were abnormal, he concluded that other medical evidence in the record supported the ALJ's findings. *See id.*

With respect to Plaintiff's residual functional capacity ("RFC"), Magistrate Judge Homer found that, because the ALJ decided to afford Dr. Woods' opinion little weight, Dr. Woods' restrictions did not apply to the ALJ's RFC findings. He also found that the ALJ's finding was supported by the opinion of Dr. Stevens, a non-examining physician, that Plaintiff "could occasionally lift and carry twenty pounds, could frequently lift and carry ten pounds, could stand, and walk four hours, was limited in work involving hazards, and would average one day a month absence from work." *See id.* at 12 (citing [AR] 172-80). Moreover, Magistrate Judge Homer found that the ALJ's decision was supported by substantial evidence *other than* Dr. Stevens' opinion,

---

[1] Dr. Gacek, an ear, nose and throat specialist, treated Plaintiff from October 1993 through March 1996 for her vestibular symptoms, vertigo, spinning, nausea and fatigue. He sent her for several tests, including an MRI and an ENG. Both he and Dr. Woods practiced at the North Medical Center at 5100 West Taft Road, Suite 3E, Liverpool, New York, until Dr. Gacek relocated. In contrast to Dr. Gacek's treatment of Plaintiff, the Administrative Record indicates that Dr. Woods saw Plaintiff only once on August 29, 2002, when she went to him hoping for help with her vestibular neuritis. *See* Administrative Record ("AR") at 59.

including the fact that "[a] CT scan and MRI were essentially normal, . . . there was no hearing loss," *see id.*, and Plaintiff's symptoms were resolved and had stabilized. Furthermore, Plaintiff "reported in February 1996 that her dizziness was intermittent, she was active, and participated in aerobic classes regularly, and ENGs remained unchanged." *See id.* (citing [AR] 95, 101, 125, 172-75). Moreover, in December 2002, a physical RFC indicated that Plaintiff could "occasionally lift and carry twenty pounds, could frequently lift and carry ten pounds, could stand, walk, and sit six hours, and was unlimited in the use of her upper and lower extremities." *See id.* (citing [AR] 114-19). Finally, both Dr. Woods and Dr. Gacek determined that treatment was no longer necessary. *See id.* at 12-13.

Finally, with respect to Plaintiff's subjective complaints, Magistrate Judge Homer found that the ALJ's findings were supported by substantial evidence, including the extent of Plaintiff's daily activities (child care, light housework, short grocery shopping trips), that Plaintiff stopped work due to pregnancy, that there were no records of her symptoms worsening after childbirth as Plaintiff claimed, that she had a driver's license without restrictions and did limited driving, that she only visited Dr. Woods once after the alleged onset of her disability, that in 1994 she reported she was doing well, and that in 1996 her dizziness was intermittent and she was active. *See id.* at 14-16 (citations omitted).

**D.   Plaintiff's objections**

Plaintiff objects to Magistrate Judge Homer's finding that substantial evidence exists to support the conclusion that "[P]laintiff is able to perform sedentary work that does not require climbing, balancing or exposure to hazards." *See* Plaintiff's Letter dated January 9, 2006, objecting

to Magistrate Judge Homer's Report-Recommendation and Order ("Plaintiff's Objections"), at 1. The gravamen of Plaintiff's objections appears to be that the ALJ did not give controlling weight to her treating physician's opinion, that her treating physician's opinion is evidence that she is unable to work, and that his opinion is supported by the vocational expert's testimony.[2]

**E.     Plaintiff's capability to perform sedentary work that does not require climbing, balancing, or exposure to hazards**

"In determining the claimant's physical ability, or residual work capacity, the Secretary must consider objective medical facts, diagnoses and medical opinions based on such facts, and subjective evidence of pain or disability testified to by the claimant or others." *Ferraris v. Heckler*, 728 F.2d 582, 585 (2d Cir. 1984) (citations omitted).  In particular, "the opinion of a claimant's treating physician will be given controlling weight where it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Hogue v. Barnhart*, No. 03 Civ. 4963, 2005 WL 1036336, *12 (S.D.N.Y. May 3, 2005) (quotation and other citation omitted).  However, this general rule does not apply when "'the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts.'" *Id.* (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (other citation omitted).  Therefore, although

---

[2] Plaintiff also states that Dr. Woods diagnosed her "with chronic vestibular neuropathy secondary to vestibular neuritis . . . [which] were diagnosed with vestibular testing . . .," *see* Plaintiff's Objections at 1, and that she "suffers from vertigo, nausea, malaise, sensitivity to noise, visual disturbances, mood changes, inability to concentrate and exhaustion." *See id.* Furthermore, she states that the vertigo is constant and that "she suffers an extreme exacerbation once or twice a week. *See id.* (citation omitted). Dr. Woods' opinion reflects this diagnosis and these symptoms. *See* AR at 91-95

generally the ALJ must give more weight to an examining physician's opinion than to a non-examining physician's opinion, *see Torregrosa v. Barnhart*, No. CV-03-5275, 2004 WL 1905371, *5 (E.D.N.Y. Aug. 27, 2004) (quotation omitted), "the regulations allow 'the opinions of nonexamining sources to override treating sources' opinions, provided they are supported by evidence in the record.'" *Hogue,* 2005 WL 1036336, at *15 (quoting *Schisler v. Sullivan*, 3 F.3d 563, 568-69 (2d Cir. 1994)) (other citation omitted).

When the ALJ does not afford a claimant's treating physician's opinion controlling weight, the ALJ must consider the following factors to determine the amount of weight to afford that opinion: "'(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors.'" *Id.,* 2005 WL 1036336*,* at *13 (quotation and other citation omitted).

### 1. Weight given to Dr. Woods' opinion

The ALJ gave little weight to Dr. Woods' opinion that "claimant would need to take unscheduled breaks during the course of an 8-hour workday and would be unable to work for 4 days a month due to impact of the impairment and treatment" because it is not supported by objective medical evidence in the record, Plaintiff's wide range of daily activities and the opinions of a medical expert and a reviewing physician. *See* AR at 15. The ALJ stated that Plaintiff's condition would not preclude her from lifting and carrying ten pounds frequently, sitting for six hours or standing or walking for two hours in an eight hour period; however, he noted that her capability to work at a sedentary position was reduced by her inability to perform jobs involving climbing,

balancing or exposure to hazards. *See* AR at 14.

There is substantial evidence in the record to support the ALJ's determination that Dr. Woods' opinion was not controlling and should be afforded little weight. Dr. Woods examined Plaintiff on only one occasion. Her first and last visit to Dr. Woods was on August 29, 2002.[3] *See* AR at 59. Prior to that time, Dr. Gacek had treated Plaintiff. *See id.* There is nothing in the record to indicate that either Dr. Gacek or Dr. Woods treated Plaintiff between her last visit to Dr. Gacek in 1996 and her visit to Dr. Woods in 2002, even though she claims that her symptoms became severe after giving birth to her daughter in 1999.[4]

Furthermore, Dr. Woods' opinion that Plaintiff would need unscheduled breaks and would be absent from work approximately four days each month is not supported by objective medical evidence and is inconsistent with the opinions of the medical expert and the reviewing physician. According to Dr. Woods' Residual Functional Capacity Questionnaire ("RFC"), dated January 23, 2003, Plaintiff has vestibular neuritis as demonstrated by caloric or other vestibular tests. *See* AR at 121. Dr. Woods indicated that Plaintiff's symptoms included vertigo, nausea, vomiting, malaise, sensitivity to noise, visual disturbances, mood changes, mental confusion/inability to concentrate,

---

[3] Although Plaintiff's application for benefits clearly indicates that she saw Dr. Woods only once, the parties in this action appear to be under the assumption that Dr. Woods treated Plaintiff over a period of time. *See* AR at 59; Plaintiff's Objections at 1; Report-Recommendation and Order at 5, 9. The record indicates that Dr. Woods signed Plaintiff's 1996 ENG, and there is a progress note from April 22, 1996, that follows the report; however, that note does not indicate who completed it. *See* AR at 126-28.

[4] In August 1999, Plaintiff complained to Mary Oot, a nurse practitioner, and to Dr. Alexander, her primary care physician, that her vertigo and fatigue had worsened after the birth of her daughter. *See* AR at 141. As a result, they ordered a CT, the results of which were normal. *See* AR at 165. Plaintiff also stated that, after that time, she "fe[lt] better" and had no further episodes. *See* AR at 140. Based upon the record, it appears that Ms. Oot and Dr. Alexander continued Plaintiff on Antivert and Valium. *See* AR at 136-41.

and fatigue. *See id.* at 122. Furthermore, his RFC indicated that Plaintiff experienced constant vertigo and severe exacerbation one to two times per week and that an attack typically lasted two weeks. *See id.* Her attacks, according to Dr. Woods, were precipitated by stress, exertion, sudden movement, certain lights and computer screens; he also noted that noise and an increase in her activity would worsen the attack. *See id.* Additionally, Dr. Woods opined that, during an attack, Plaintiff would be precluded from work and would need to take one- to two-hour unscheduled breaks during an eight hour work day and would probably miss about four days of work each month but that, nonetheless, she was capable of a low stress job. *See id.* at 124.

These findings conflict with the objective medical record. Dr. Gacek treated Plaintiff from 1993 through 1996. In 1993, Dr. Gacek scheduled Plaintiff for an ENG, which was abnormal and suggested vestibular neuritis. In December of 1994, Plaintiff stated that she was doing well and compensating and only experienced disequilibrium when fatigued. *See* AR at 100. Her exam revealed normal auditory canals and tympanic membranes. *See id.* In August 1995, Dr. Gacek's medical notes indicate that Plaintiff was "doing better all the time" and that Plaintiff managed her attacks of dizziness, which occurred weekly or monthly, by taking Antivert. *See id.* at 99. In February 1996, Dr. Gacek's notes indicate that, although Plaintiff's dizziness disturbs her, it is intermittent and she participates in activities and does aerobic exercise regularly. *See id.* Nonetheless, he scheduled a second ENG to determine whether Plaintiff's condition was progressing and determined, in March 1996, that, although it was not progressing, there was nothing he could do for the condition and prescribed Valium in addition to the Antivert to help her control it. *See id.* Furthermore, an MRI that Dr. Gacek ordered in 1994 came back negative for multiple sclerosis or tumor faction. *See id.* at 101. Nothing in Dr. Gacek's notes or records indicates that Plaintiff was

having severe attacks or that these attacks limited her ability to work. In fact, during her treatment with Dr. Gacek, Plaintiff worked as a medical secretary from 1992 through 1998.[5] *See id.* at 72.

Furthermore, Dr. Woods' opinion of Plaintiff's condition and limitations conflicts with his own treatment notes. In 2002, Dr. Woods noted that Plaintiff was in no distress, was awake, alert and oriented. *See* AR at 125. Her tympanic membranes were clear, and her nasal and oropharyngeal exam showed no signs of masses, ulceration or inflammation. *See id.* Plaintiff demonstrated normal hearing and could touch her finger to her nose without difficulty. *See id.* Dr. Woods' notes indicate that Plaintiff was at his office only to see if there had been a change in her diagnosis and that there had been no change in her symptomology since her last visit to the office in 1996. *See id.* He stated that he would see her back on an as-needed basis. *See id.* His notes do not indicate that he scheduled any diagnostic tests, nor do they document any increase in the severity of Plaintiff's symptoms. In fact, he documents no change in symptomology from her previous visit in 1996; and, at that time, Plaintiff was working and "doing well." Furthermore, when Plaintiff left work in December 1998, she did so because of her pregnancy not because of her vestibular neuritis. *See* AR at 190.

Additionally, Dr. Woods' opinion conflicts with those of the medical expert and reviewing physician. In December 2002, the medical expert opined that Plaintiff could stand and/or walk for six hours in an eight hour work day and could sit with *normal* breaks for about six hours in an eight hour work day. *See* AR at 115, 117. This expert also stated that, according to the records, Plaintiff's condition was stable and the exam itself was negative. *See id.* at 120. Dr. Woods' opinion also

---

[5] Plaintiff states that her employer, at its discretion, transferred her to a slower-paced office with less responsibility and that she missed work frequently, sometimes for several days at a time. *See* AR at 57.

-11-

conflicts with the opinion of Dr. Stevens, a non-examining physician, who stated that, according to Plaintiff's medical records, her impairments would not require unscheduled breaks, would require her to be absent probably once a month, would not affect her ability to sit, and would not affect her ability to stand or walk for four hours out of an eight hour workday. *See* AR at 177, 178, 180. Dr. Stevens also indicated that Plaintiff's difficulty taking care of her children was not supported by any physical findings, *see id.* at 175, and that the medical evidence did not support Dr. Woods' opinion because, rather than conducting his own caloric tests, Dr. Woods had relied on tests from 1997. *See id*. at 176. Both Dr. Stevens and the medical expert, however, did indicate that Plaintiff would be limited to jobs that did not involve climbing, balance or exposure to hazards, and that she was capable of lifting and carrying twenty pounds occasionally and lifting and carrying ten pounds frequently. *See id.* at 115-16, 120, 178.

     Plaintiff's wide range of daily activities also supports the ALJ's determination that Dr. Woods' opinion should be afforded little weight. Plaintiff has an unrestricted driver's license; and, although she only drives short distances, she drives daily either to take her daughter to pre-school or to grocery shop. *See* AR 191-92. Although she calls family to help her with her young children two to three times a week, she is capable of caring for them during the day by herself the rest of the time. *See id.* Plaintiff states that her condition is stable and that she has the energy and concentration to care for her children as long as she paces herself and rests frequently. *See id.* at 202. In addition to caring for her children, she also prepares easy meals, does light housework, attends church once a week, attends social gatherings with friends once or twice a month, and has gone on a four and one-half hour car ride to vacation even though car trips make her vertigo worse. *See id.* at 84-85, 202-03. She also reads, watches television (news and game shows), and plays with her children. *See id.*

at 202.

Furthermore, Dr. Woods opines on his RFC, and Plaintiff confirms, that she has trouble concentrating, has vision problems, is sensitive to noise and that any head movement exacerbates her condition; however, her medical records provide no support for or indication of these symptoms. *See* AR at 210, 208, 122. Plaintiff also testified that, after giving birth, her symptoms worsened, *see id.* at 190, but there is no medical record of her returning to see either Dr. Woods or Dr. Gacek. However, there is a notation in her primary care physician's notes that there was an increase in the severity of her vertigo. *See id.* at 141, 190. Nonetheless, the results of a CT were normal; and, after that time, she had "no further episodes" and was "feeling better." *See id.* at 140. Furthermore, all of the doctors, including Dr. Woods, agree that her condition is stable. Plaintiff also stated that, when she was working, her employer worked with her and gave her breaks; however, her symptoms are exacerbated at present because she does not get a break from her children and, therefore, does not get the rest that she needs. *See id.* at 208. In addition, Plaintiff testified that she is completely incapacitated by her condition once every two or three months for approximately two weeks; however, this statement contradicts Dr. Woods' RFC, which indicates that an attack occurs once or twice a week and that a "typical" attack lasts up to two weeks. *See id.* at 193.

In sum, there is substantial evidence in the record to support the ALJ's decision to give Dr. Woods' opinion little weight because Dr. Woods saw Plaintiff on only one occasion (although he did read her ENG in 1996) and provided no treatment, his opinion conflicts with his own treatment notes and other facts in the record, and his opinion conflicts with the opinions of a medical expert and the reviewing physician, both of which are supported by facts in the record (her ability to work in 1996 and previously with no change in symptomology and her range of daily activities).

Therefore, the Court concludes that the ALJ's decision to afford Dr. Woods' opinion regarding Plaintiff's need for unscheduled breaks and her probable absence from work four days each month little weight is supported by substantial evidence in the record.

### *2. Plaintiff's ability to perform sedentary work*

Since the ALJ gave Dr. Woods' opinion regarding Plaintiff's need for unscheduled breaks and the likelihood that she would be absent from work for up to four days each month little weight, he did not rely upon this opinion in his RFC determination. Moreover, when the ALJ presented Mr. Festa, a vocational expert, with a hypothetical in which the person was the same age and had the same education and past work experience as Plaintiff with the residual functional capacity of being able to walk or stand for six hours in an eight hour day and sit for a total of approximately six hours in an eight hour day with normal breaks, occasionally lift twenty pounds and frequently lift and carry ten pounds, and avoid balancing, climbing and exposure to hazards, Mr. Festa opined that such a person could work as a medical secretary, a cashier, or an informal clerk. *See* AR at 217-18.

Plaintiff disagrees, claiming that none of the physicians who examined her challenged the restrictions that Dr. Woods imposed. *See* Plaintiff's Objections at 1. However, an ALJ is allowed to consider both the non-examining physicians' opinions as well as the treating physician's opinion and to give more weight to the non-examining physicians' opinions when the treating physician's opinion is not consistent with substantial evidence in the record and the non-examining physicians' opinions are supported by evidence in the record. *See Hogue*, 2005 WL 1036336, at *12, *15; *Torregrosa*, 2004 WL 1905371, at *5. In this case, the ALJ found that Dr. Woods' opinion was inconsistent with, and not supported by, either Plaintiff's medical records or her range of daily activities; and,

thus, the ALJ properly relied upon the non-examining physicians' opinions, which are supported by the record, in reaching his determination and in according Dr. Woods' opinion little weight.

Moreover, even if the Court does not take into account Dr. Stevens' opinion regarding Plaintiff's capability to work, the objective medical record and Plaintiff's range of activities, although limited in some respects, substantially support the ALJ's finding of no disability. Furthermore, the medical records indicate that Plaintiff's MRI and CT scans were normal, that her symptoms were stable, that her treatment was conservative (Antivert and Valium), and that in 1996 her dizziness was only intermittent. *See* AR at 101, 165. In addition, a physical RFC completed in December 2002, indicated that Plaintiff could lift and carry ten pounds frequently, that she could sit for six hours and that she could stand/walk for six hours out of an eight hour workday with normal breaks. *See* AR at 115, 117. The medical records also demonstrate that Plaintiff was stable, that her ENG had not changed, and that she was "doing well" and participating in aerobic classes and other activities. *See* AR at 95, 101, 125. Additionally, Dr. Woods indicated that he only needed to see Plaintiff on an as-needed basis after her visit in 2002. *See* AR at 125.

For all these reasons, the Court affirms the ALJ's determination that Plaintiff is capable of sedentary work that does not involve climbing, balancing or exposure to hazards.

## IV. CONCLUSION

After carefully considering Magistrate Judge Homer's January 3, 2006 Report-Recommendation and Order, Plaintiff's objections thereto, the relevant parts of the record, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Homer's January 3, 2006 Report-Recommendation and

Order is **ADOPTED IN ITS ENTIRETY**; and the Court further

**ORDERS** that Defendant's determination of no disability is **AFFIRMED** and Plaintiff's complaint is **DISMISSED**; and the Court further

**ORDERS** that the Clerk of the Court enter judgment in favor of Defendant and close this case.

**IT IS SO ORDERED.**

Dated: July 6, 2006.
Syracuse, New York

_____
Frederick J. Scullin, Jr.
Senior United States District Court Judge